**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KHASHIR GARDNER, administrator** | : | **CIVIL ACTION** |
| **of the estate of Trent Mason, on behalf** | : | |
| **of himself and the estate of Trent Mason** | : | |
| | : | |
| **v.** | : | **NO.  24-459** |
| | : | |
| **COMMISSIONER BLANCHE** | : | |
| **CARNEY,** *et al.* | : | |

**MEMORANDUM**

**MURPHY, J.**                                                                        **May 4, 2026**

This civil rights case arises out of the tragic death of a man detained at Philadelphia's

Curran Fromhold Correctional Facility (CFCF).  On the evening of February 8, 2022, Trent

Mason — who had suffered from mental-health issues during his time in pretrial detention —

was found unresponsive, lying face down in his cell in several inches of water.  The sprinkler in

his cell had burst.  For over two hours, water had been gushing out from under his door and

flowing into the detention unit, while an alarm flashed and beeped throughout the unit.  No one

responded to the flooding or alarm.  No one responsible was even there, including the

correctional officer assigned to that unit.  When staff found Mr. Mason, they were unable to

revive him, and he was pronounced dead at the scene.  Mr. Mason's daughter, plaintiff Khashir

Gardner, brings this § 1983 claim seeking relief on behalf of herself and her father for his death,

arguing, among other claims, that various individual CFCF prison officials and staff and the City

of Philadelphia are responsible for their failure to ensure Mr. Mason's safety and access to

adequate mental health care.  Several of the individual defendants, as well as the City, move for

summary judgment.  For the reasons that follow, we grant in part and deny in part defendants'

joint motion; this case will proceed to trial.

## I.    FACTUAL BACKGROUND[1]

From January 31, 2022, through February 8, 2022, Mr. Mason was held in pre-trial

detention at CFCF of the Philadelphia Department of Prisons (PDP) in the intake unit, located in

B Building, 1st Floor, Pod 4 (B1-Pod 4).  DI 137-1 at ¶ 3.  Initially, Mr. Mason was held on

$7,500 in bail, as well as a scofflaw warrant for failing to pay traffic tickets amounting to $5,295.

*Id.* at ¶¶ 4-5.  On Friday, February 4, 2022, Mr. Mason's bail was changed to secured, allowing

him to be released with the signature of the Traffic Court[2] judge.  *Id.* at ¶¶ 4-5.  The Traffic

Court set the policy for detainees who are held on scofflaw warrants, whereby individuals

detained for unpaid traffic or parking tickets totaling more than $5,000 are detained until the

following business day.  *Id.* at ¶¶ 5, 10.  CFCF placed Mr. Mason on the transport list to be

taken to Traffic Court on Monday, Tuesday, and Wednesday of the next week (February 7th-9th),

but for undetermined reasons,[3] he was not transported to Traffic Court.  *Id.* at ¶¶ 6, 8.

On February 8, 2022, CFCF escorted Mr. Mason to the Behavioral Health Unit for an

---

[1] It was a bit of a struggle to get the summary judgment record joined.  We ended up with a joint statement of undisputed facts that spans a hefty 235 pages.  That is not ideal.  We advise counsel to keep the definition of "dispute" in mind in this case and future cases.  Not every fact is disputable.  Here, we identified very few actual disputes of fact — despite the many notations by plaintiff that a given fact was disputed or required additional "context."  Our ability to identify the material facts in dispute was undoubtedly hampered by the lengthy and often repetitive paragraph-form factual recitations contained in this statement, many of which were not directly responsive to the asserted fact.  No lawyer would try a case that way, so why would anyone think it is a useful way to present the issues for summary judgment?

[2] Since the events of this case occurred, the Traffic Court became the Municipal Court.

[3] Deposition testimony indicates that Mr. Mason may not have been transported due to a COVID-related quarantine of Mr. Mason's pod.  DI 137-2 at 28.

emergency referral to obtain a suicide risk evaluation,[4] based on the following complaint:

> Emergency Referral from Unit Officer - I/M[5] was yelling and stating he was unstable in order to be brought down to see MH staff. Once in the office I/M stated his bail was paid, and was questioning why he was still here. I/M denied any SI [Suicidal Ideation] or HI [Homicidal Ideation] and said he isn't going back up to the unit because he feels people will forget about him. I/M was cleared from emergency status, and escorted back to his unit. While escorted back he broke away from the CO's and ran down the hall to [try] to get out somehow. Several CO's chased him and forcefully escorted him back to his cell.

*Id.* at ¶ 12 (citation omitted). Defendant Douglas Ford, LSW[6] conducted a mental health screening of Mr. Mason at around 1:25 AM that morning, concluded that Mr. Mason was at a low suicide risk and did not appear to be a danger to himself or others, and "cleared [him] from emergency status" such that he could be returned to his cell. *Id.* at ¶¶ 13-14. Mr. Mason was returned to his cell at approximately 2:29 AM. *Id.* at ¶ 15. Defendant Correctional Officers Shaun Henry and Ava Rawls moved Mr. Mason from a shared cell to an individual cell during the 7:00 AM to 3:00 PM shift that day. *Id.* at ¶¶ 20-21. Defendant Correctional Officer Tionya Griffin[7] replaced Correctional Officer Rawls and was assigned to B1-Pod 4 — where Mr. Mason was detained. *Id.* at ¶ 28. When Correctional Officer Griffin attempted to serve Mr. Mason his meal, she observed him sitting on his table and saying nonsensical things, such that she did not feel comfortable

---

[4] Correctional Officer Robert Taylor, whose supervisor that shift was Sergeant Swinton, escorted Mr. Mason to the Behavior Health Unit. DI 137-1 at ¶¶ 15-16.

[5] "I/M" is a notation for inmate, referring to Mr. Mason.

[6] Mr. Ford is not one of the movants in the instant motion for summary judgment.

[7] Correctional Officer Griffin did not join defendants' joint motion for summary judgment.

opening his cell door and did not give him his meal. *Id.* at ¶¶ 33-34. At no point did Correctional Officer Griffin contact any supervisors to report Mr. Mason's behavior, despite prison procedure requiring her to do so, nor did she refer Mr. Mason for mental health services. *Id.* at ¶¶ 35-36, 39.

At the time, Defendant Lieutenant Graves was the assigned supervisor for B Building (and thus, for Correctional Officer Griffin and B1-Pod 4), but Lieutenant Graves arrived approximately 3 hours and 45 minutes late for her shift due to car issues. *Id.* at ¶¶ 61-62, 96. It is disputed whether Sergeant Swinton, the assigned supervisor for A Building, was told to oversee B Building to cover for Lieutenant Graves. *Id.* at ¶¶ 25-27, 87, 89-90, 97-99. CFCF was understaffed during the 3:00 PM to 11:00 PM shift, as full staffing required two sergeants assigned to each building; instead, there were no sergeants assigned to B Building. *Id.* at ¶¶ 88-89, 100, 102. The captains during the 3:00 PM to 11:00 PM shift were Captains Gerald Simmons and Walter Gray. *Id.* at ¶ 91; DI 137-2 at 135 (Exhibit H).

Against CFCF policy, Correctional Officer Griffin left the pod to go to lunch without informing or asking permission from any supervisor, leaving the pod completely unstaffed, from 6:19 PM until 8:50 PM.[8] *Id.* at ¶¶ 43, 46, 55. Around approximately 8:50 PM, an inmate-worker informed Correctional Officer Griffin (who was stationed at the booth outside B1-Pod 4 at this time) that inmates were banging in B1-Pod 4. *Id.* at ¶ 66. This prompted Lieutenant Graves (who was standing nearby) to direct Correctional Officer Karen Melton to check on B1-Pod 4 and, when Lieutenant Graves encountered

---

[8] PDP policy only permits a thirty-minute lunch break. *Id.* at ¶ 57.

Sergeant Swinton in the corridor between buildings, to ask Sergeant Swinton to assist Officer Melton. *Id.* at ¶¶ 67-69. This was the first time that Sergeant Swinton was seen in B Building during the 3:00 PM to 11:00 PM shift. *Id.* at ¶¶ 74-75. Upon arriving at B1-Pod 4, Sergeant Swinton and Correctional Officer Melton observed water running from under Mr. Mason's cell door (resulting from his sprinkler being popped) and found Mr. Mason unresponsive, with his face down in the water on the floor. *Id.* at ¶ 80. Despite efforts to revive him, he was pronounced dead at the scene. *Id.* at ¶ 81. The Philadelphia Medical Examiner ruled his death a suicide by drowning. *Id.* at ¶ 83.

## II.    MOTION AT ISSUE

Defendants Commissioner Blanche Carney, Deputy Commissioner Terence Clark, Deputy Wardens Karen Butler[9] and Steven Angelucci, Captains Walter Gray and Gerald Simmons, Lieutenant Diara Graves, Sergeant TiaMarie Swinton, Correctional Officers Ava Rawls and Shaun Henry, Director of Classification, Movement, and Registration (CMR) Christopher Thomas, and the City of Philadelphia have filed a joint motion for summary judgment.[10] DI 137 at 1. For every individual defendant[11] except for Director Thomas,

---

[9] Deputy Warden Butler is sometimes included, and sometimes omitted, as a moving defendant in defendants' joint motion. *See, e.g.*, DI 137 at 12, 23, 36. For purposes of this memorandum, we treat Deputy Warden Butler as a moving defendant.

[10] Additionally, defendants jointly request that all claims against Chief of Medical Operations Bruce Herdman, Lieutenant Donovan Bynum, and Correctional Officer Aisha Ryans be dismissed, noting that plaintiff's counsel informed defendants that plaintiff was discontinuing the action against these defendants. DI 137 at 19. Of note, Warden Nancy Gianetta was voluntarily dismissed on March 22, 2024 (DI 24) and Correctional Officer Karen Melton was voluntarily dismissed on September 25, 2025 (DI 113).

[11] These defendants include: Sergeant Swinton, Commissioner Carney, Deputy

5

defendants argue that plaintiff failed to provide any evidence that they "acted with deliberate indifference to any alleged mental health or safety need of the plaintiff" and specifically emphasize the lack of evidence that they knew that Mr. Mason (1) had a serious medical need; (2) was at a specific risk of suicide or excessive risk of harm; (3) was in an unattended pod; (4) was in a cell with a broken sprinkler; or (5) was ever in a position of danger at any time. *Id.* at 3. Because there is no evidence that defendants knew plaintiff was at an excessive risk of harm, or that they had a subjective appreciation of such harm, defendants argue that summary judgment in their favor is warranted. *Id.* Additionally, defendants assert that the supervisory defendants are entitled to qualified immunity respecting plaintiff's claim that they denied Mr. Mason mental health care. *Id.* at 19. And even if qualified immunity did not apply, defendants insist there is no supervisory liability because (1) simply leaving the block unattended is insufficient for a conditions of confinement claim; (2) the lack of staffing on Mr. Mason's pod resulted from Correctional Officer Griffin's failure to inform a supervisor that she was leaving the pod (which violated CFCF policy); and (3) supervisor liability cannot be established based on what a supervisor should have known. *Id.* at 26-30; DI 141 at 3. As for Director Thomas, defendants argue that plaintiff's failure to release claim must be dismissed because plaintiff neither raises a probable cause challenge to his detention nor demonstrates Director Thomas's deliberate indifference — both of which are required for a Fourteenth Amendment claim. DI 137 at 37-38. Defendants further insist that, at the time of his death, Mr. Mason was being held on a valid warrant, such that his detention was valid. DI 141 at 2. Regarding the City, defendants urge us

---

Commissioner Clark, Deputy Warden Angelucci, Captains Gray and Simmons, Lieutenant Graves, and Correctional Officers Rawls and Henry. DI 137 at 12.

to dismiss plaintiff's *Monell* claims for lack of evidence of the City's deliberate indifference. DI 137 at 41-42; DI 141 at 5-6. Finally, defendants argue that plaintiff's state law derivative claims must be dismissed because, if we grant summary judgment on plaintiff's federal claims, then there is no independent surviving claim. DI 137 at 42.

Plaintiff opposes defendants' motion, asserting that there is sufficient evidence to submit this case to a jury. DI 140. On count one, plaintiff argues that Director Thomas administered "a practice and policy" that failed to ensure that incarcerated individuals who paid their bail were promptly notified of their pending release and transported for release. *Id.* at 38-39. She insists that allowing incarcerated individuals "to remain unlawfully in custody for five days before initiating any inquiry into that inmate's unlawful detention[] demonstrate[d] deliberate indifference to" Mr. Mason's liberty and safety and constituted a violation of his due process rights. *Id.* at 40. Regarding count two, plaintiff argues that the evidence clearly establishes that Mr. Mason "was suffering with a serious mental health crisis which continued after he received a mental health assessment" and that "Defendants Rawls, Henry, Griffin and Swinton were all aware of Mr. Mason's condition." *Id.* at 11. She asserts that "almost every Defendant and additional correctional employees testified that an inmate sent back to the pod following an evaluation by the mental health unit that continues to exhibit signs of a serious mental health disorder must be referred back to the mental health unit" but that the defendants failed to make such a referral, resulting in Mr. Mason's death. *Id.* And she insists that the supervisors were aware of the dangerous practice of abandoning housing units whereon inmates suffering with mental-health issues were housed. *Id.* at 20-23. As for count three, plaintiff contends that there is sufficient evidence to find defendants maintained unconstitutional conditions of confinement

given that "everyone knew up and down the chain of command, Sergeants, Lieutenants, Captains, Deputy Wardens, Wardens up through the Commissioner that there was a longstanding practice of post abandonment by officers assigned to fixed posts" and that two deaths on the same pod resulted from such abandonment, less than one year before Mr. Mason's death. *Id.* at 13. Nor, plaintiff maintains, are defendants entitled to qualified immunity because (1) the question of their liability should be a jury question, particularly when it rests upon credibility determinations; and (2) defendants' actions respecting Mr. Mason and his pod were objectively unreasonable. *Id.* at 28-29. As for the City, plaintiff argues that policymakers failed to properly supervise and ensure coverage for their subordinates on fixed mandatory posts. *Id.* at 32. She also asserts that there was (1) a policy, practice, or custom of Correctional Officers abandoning the housing units for extended periods of time, of which policymakers were aware and could confront; and that (2) such a situation involved a difficult choice or history of mishandling; whereby (3) the mishandling of that situation by an employee would often cause a deprivation of constitutional rights. *Id.* (citations omitted). Finally, because she maintains that her claims against the City survive summary judgment, plaintiff argues that her wrongful death and survival claims should likewise remain. *Id.* at 40.

## III.    LEGAL STANDARDS

### A.    Summary judgment

Summary judgment is appropriate when the movant demonstrates "that there is no genuine dispute as to any material fact" such that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Genuine issues of material fact refer to any reasonable disagreement over an outcome-determinative fact." *In re Energy Future Holdings Corp.*, 990

8

F.3d 728, 737 (3d Cir. 2021) (citation omitted).  When assessing a summary judgment motion, we must "view the record and draw inferences in a light most favorable to the non-moving party."  *In re IKON Off. Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002) (citation omitted).  We also must assess whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## B.     Section 1983 claims

Section 1983 permits individuals, including prisoners, to bring civil lawsuits based upon deprivations of their federal constitutional rights by persons acting under color of state law.  42 U.S.C. § 1983.  But this provision does not provide standalone substantive rights; rather, it acts as a mechanism for remedying violations of federal law committed by those acting under state authority.  *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996) (citations omitted).

Under the qualified immunity doctrine, government officials are shielded from civil damages liability so long as their actions did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  We examine whether (1) the plaintiff's alleged facts demonstrate a violation of a constitutional or statutory right; and (2) the law was clearly established when the violation occurred.  *Id.* (citation omitted); *Harlow*, 457 U.S. at 818.  "Qualified immunity protects official action if the officer's behavior was objectively reasonable in light of the constitutional rights affected."  *Carter v. City of Philadelphia*, 181 F.3d 339, 356 (3d Cir. 1999) (citation modified) (citation omitted).

9

C.      **Monell liability**

Known as *Monell* liability, a municipality may be held liable under 42 U.S.C. § 1983 when the municipality's official policy or custom, or its failure or inadequacy (accompanied by deliberate indifference) caused a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978); *Forrest v. Parry*, 930 F.3d 93, 105-06 (3d Cir. 2019). A plaintiff may bring "claims sounding in both" policy or custom as well as in a failure to train, supervise, or discipline subordinates. *Forrest*, 930 F.3d at 106.

To establish a policy-or-custom-based *Monell* claim, the plaintiff must demonstrate that (1) the municipality had (a) a policy (*i.e.*, something that "is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issue[d] an official proclamation, policy, or edict" or (b) a custom (*i.e.*, "a given course of conduct" that, though not specifically authorized by law or endorsed, "[wa]s so well-settled and permanent as virtually to constitute law"); that (2) proximately caused the plaintiff's injuries. *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (citations omitted). Causation requires "an affirmative link between the policy or custom and the particular constitutional violation" alleged, which may be established by demonstrating that (1) the municipality knew of prior similar unlawful conduct and failed to take measures to prevent future similar violations; and (2) the municipality's failure at least partially caused plaintiff's injury. *Id.* (citation modified) (citation omitted). The question of whether the municipality's custom proximately caused plaintiff's constitutional injury generally should go to the jury "[a]s long as the causal link is not too tenuous." *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990). Additionally, the plaintiff need not prove that the municipality formally approved the custom. *Roman*, 914 F.3d at 798

10

(citation omitted).

For *Monell* claims predicated on a municipality's failure to train, supervise, or discipline subordinates, the plaintiff must demonstrate that the municipality failed or was inadequate with respect to its training, supervision, or discipline of subordinates, in a manner that reflected deliberate indifference and caused the plaintiff's injuries. *Forrest*, 930 F.3d at 105. "A plaintiff sufficiently pleads deliberate indifference by showing that (1) municipal policymakers know that employees will confront a particular situation[,] (2) the situation involves a difficult choice or a history of employees mishandling[,] and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Roman*, 914 F.3d at 798 (citation modified) (citation omitted). The plaintiff need not allege an unconstitutional municipal policy or custom if bringing a *Monell* claim under this theory. *Forrest*, 930 F.3d at 105-06 (citation omitted).

## IV.    DISCUSSION

### A.    We grant summary judgment in favor of Director Thomas on all claims against him

Plaintiff brings two counts against Director Thomas. The first is based upon unlawful detention and failure to release from custody. These claims arise out of Director Thomas's role, as the Director of CMR, in failing to timely transport Mr. Mason from CFCF to Traffic Court so that he could be released from custody after he paid his bail. Construing the record in the light most favorable to plaintiff, as the non-moving party, we find that there is no genuine dispute as to any material fact respecting these claims — which necessarily arise under the Fourth Amendment given Mr. Mason's status as a pretrial detainee — and that Director Thomas is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

Under the Fourth Amendment, an incarcerated individual may challenge the lawfulness

11

of his pretrial detention.  For pretrial detention of an individual to be lawful under the Fourth

Amendment, there must be probable cause to detain him.  *Baker*, 443 U.S. at 142-43 (citation

omitted); *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562-63 (2024) (citation omitted).  "And

even when a detention is justified at the outset, it may become unreasonably prolonged if the

reason for it lapses."  *Chiaverini*, 602 U.S. at 563 (citation omitted).  As the Third Circuit

explained in *Delade v. Cargan*, the Fourth Amendment — rather than the Fourteenth

Amendment's Due Process Clause — is "the appropriate provision of the Constitution under

which to analyze allegations of unlawful arrest and pretrial restraint."  972 F.3d 207, 211 (3d Cir.

2020) (citations omitted); *id.* at 208 ("[A] claim alleging unlawful arrest and pretrial detention

that occur prior to a detainee's first appearance before a court sounds in the Fourth

Amendment—and not the Due Process Clause of the Fourteenth Amendment."); *see also Manuel*

*v. City of Joliet*, 580 U.S. 357, 369 (2017) ("[T]he Fourth Amendment governs a claim for

unlawful pretrial detention even beyond the start of legal process.").  Thus, under the more-

specific provision rule, a constitutional claim — such as one for unlawful pretrial detention —

must be analyzed under the Fourth, not the Fourteenth, Amendment.[12]  *Delade*, 972 F.3d at 210

(citations omitted); *see also United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) (citation

omitted).

At the time of his death, Mr. Mason was detained at CFCF based on a scofflaw warrant

issued by the Philadelphia Traffic Court.  DI 137-1 at ¶ 5.  Plaintiff does not challenge the

validity of this warrant, on probable cause or other grounds.  Nor is there reason in the record to

---

[12] We note that, as the Supreme Court recognized in *United States v. Salerno*, pretrial
detention in and of itself is not a violation of substantive due process under the Fourteenth
Amendment.  481 U.S. 739, 751 (1987).

question the validity of the warrant or Mr. Mason's detention thereupon.  Plaintiff instead

challenges the policy of holding pretrial detainees until the next business day after their bail is

paid (and only thereafter taking them to Traffic Court to be released from custody) if the

scofflaw warrant is based on more than $5,000 in unpaid traffic tickets.  *Id.*  We cannot treat a

challenge to the policy regarding the transfer of prisoners to Traffic Court as a challenge to the

legality of detaining Mr. Mason, especially given that, when he was detained, his warrant

remained effective and presumably would remain as such until the Traffic Court ordered his

release.  Thus, summary judgment on plaintiff's Fourth Amendment claim against Director

Thomas is warranted in Director Thomas's favor.[13]

Summary judgment in Director Thomas's favor is also warranted on plaintiff's second

count against him: that he subjected Mr. Mason to unconstitutional conditions of confinement.

There is nothing in the record to indicate that Director Thomas was involved in Mr. Mason's

custody beyond his role at CMR to facilitate his transport to Traffic Court.  Nor does any

evidence suggest that Director Thomas was aware of endemic staffing shortages (or the

---

[13] Even if we ignored the more-specific provision rule and considered plaintiff's
Fourteenth Amendment claim, plaintiff does not provide any argument or evidence that the
proceeding that placed Mr. Mason in pretrial detention violated his substantive due process
rights.  Again, plaintiff simply argues that CMCF was too slow to transport Mr. Mason to Traffic
Court once his bail was paid — an argument that has nothing to do with whether he was lawfully
detained in the first place.  Nor does the record indicate that Director Thomas exhibited
"deliberate indifference toward [Mr.] Mason's liberty interest[,]" DI 140 at 40, given the record
demonstrates that (1) Mr. Mason was lawfully detained, based upon the scofflaw warrant, the
entire time he was housed at CFCF; (2) CMR continued to place Mr. Mason on the transport list
to be taken by the Sheriff to Traffic Court; and (3) Director Thomas was not responsible for the
policy of holding incarcerated individuals whose detainer exceeded $5,000.  DI 137-2 at 28-29,
34; *see also Sample v. Diecks*, 885 F.2d 1099, 1109-10 (3d Cir. 1989), *abrogated in part by
Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (describing deliberate indifference in the context
of an Eighth Amendment claim predicated upon an individual's continued incarceration after he
completed his prison sentence).

abandonment of mandatory posts), or that he knew of the risks to health and safety such shortages posed.  And there is no showing that he failed to ensure proper staffing or supervision of Mr. Mason's pod.  The sole evidence respecting Director Thomas pertains to his discrete role at CMR, evidence upon which we do not believe a reasonable jury could rely to find him liable for maintaining unconstitutional conditions of confinement.  Accordingly, we grant summary judgment in Director Thomas's favor on all claims against him.

**B.      Summary judgment is denied with respect to all remaining individual movants**

Plaintiff brings claims against all other individual movants regarding inadequate medical care and unconstitutional conditions of confinement, as well as survival and wrongful death claims.  Based on the record before us, we conclude that a jury could reasonably find each remaining individual moving defendant liable for these claims.[14]  Therefore, we deny summary judgment on all claims against them.

One note about plaintiff's state-law derivative claims before we dive into the inadequate medical care and unconstitutional conditions of confinement claims.  Defendants' sole argument respecting the survival and wrongful death claims is to dismiss them because summary judgment is warranted on plaintiff's federal claims, such that no independent federal claim remains.  DI

---

[14] We reach this conclusion despite finding that, on this record, there are few genuine disputes of material fact.  These disputes include: (1) the cause and manner of Mr. Mason's death; (2) whether Sergeant Swinton was responsible for covering B Building during the 3:00 PM to 11:00 PM shift on the day that Mr. Mason died; (3) which CFCF staff members were informed of Mr. Mason's need for emergency mental health services; and (4) whether CFCF staff met the needs of the inmate population prior to COVID-19.  DI 137-2 at ¶¶ 12, 25-27, 83-84, 87, 89-90, 97-99, 114.  As explained in this memorandum, even with these few genuine factual disputes, we do not find that defendants (other than Director Thomas) are entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), as a jury reasonably could find in plaintiff's favor on this record.  *Anderson*, 477 U.S. at 248.

137 at 42.  Because, for the reasons below, we deny summary judgment on the federal claims respecting all remaining individual movant defendants, we decline to dismiss plaintiff's state-law derivative claims.  We now turn to those federal claims.

Prisoners bringing claims regarding the failure to provide adequate medical care generally may proceed under two theories: one of deliberate indifference, or one of a failure to supervise.  *Fox v. Bayside State Prison*, 726 Fed. Appx. 865, 868 (3d Cir. 2018).  Claims regarding deliberate indifference to the serious medical needs of pretrial detainees are analyzed under the Fourteenth, rather than Eighth, Amendment.  *A.M. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 584 (3d Cir. 2004).  However, when evaluating such a Fourteenth Amendment claim, we look to the standard applicable under the Eighth Amendment.  *Id.* (citations omitted).  Under the Eighth Amendment, made applicable to the states through the Fourteenth Amendment, the denial of adequate medical care to a prisoner may constitute cruel and unusual punishment.  *See Estelle v. Gamble*, 429 U.S. 97, 101-05 (1976).  Such a deprivation occurs when prison staff act with deliberate indifference toward the prisoner's serious medical needs.  *Id.* at 104 (citation modified); *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). "Deliberate indifference requires obduracy and wantonness . . . likened to conduct that includes recklessness or a conscious disregard of a serious risk." *Rouse*, 182 F.3d at 197 (citation modified) (citation omitted).  "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842 (citation modified) (citations omitted).

To bring a failure to supervise claim under the Eighth Amendment, a plaintiff must identify a supervisory practice or policy that the supervisor failed to employ and then prove that

15

(1) the procedures or policy in effect when the alleged harm occurred created an unreasonable risk of a constitutional violation; (2) the official knew that the policy or procedures created such a risk; (3) the official was indifferent to that risk; and (4) the constitutional harm was caused by the failure to implement the supervisory procedure or practice. *Fox*, 726 Fed. Appx. at 868 (citing *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 317 (3d Cir. 2014), *rev'd on other grounds sub nom. by Taylor v. Barkes*, 575 U.S. 822, 827 (2015) (per curiam)); *Sample*, 885 F.2d at 1118. Supervisors who are policymakers may be held liable under § 1983 if plaintiff demonstrates that the supervisors "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M.*, 372 F.3d at 586 (citation omitted). Supervisors, including those who are not policymakers, may be held personally liable under § 1983 if they "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *Id.* (citation omitted).

The Eighth Amendment also requires prison officials to "provide humane conditions of confinement" by "ensur[ing] that inmates receive adequate food, clothing, shelter, and medical care" and "tak[ing] reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832-33 (citations omitted); *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). To find an Eighth Amendment violation in this context, the following must be met: (1) the deprivation must be sufficiently serious, in that the prison official's act or failure to act caused the prisoner to be denied "the minimal civilized measure of life's necessities" and put him in "conditions posing a substantial risk of serious harm"; and (2) the prison official must have acted with deliberate indifference to the inmate's safety or health. *Farmer*, 511 U.S. at 834 (citation omitted). The

16

same deliberate-indifference standard applies to claims regarding conditions of confinement and inadequate medical care. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (citation omitted).

### i.      Commissioner Carney

Before Mr. Mason's death, Commissioner Carney, a policymaker, was aware of staffing issues at CFCF and that such staffing issues had (1) contributed to deaths at the facility (including two deaths on the same pod as Mr. Mason just months before his death); and (2) led to a consent agreement (reached during her time as Commissioner) whereby CFCF was monitored for staffing and other issues. DI 137-2 at 354-55, 357, 908, 1085. Though PDP policy requires the Commissioner to approve a plan for every facility's posts on an annual basis, Commissioner Carney stated that she made no policy changes in response to the various deaths preceding Mr. Mason's death because she believed the policies were sound. *Id.* at 357, 565. Indeed, she acknowledged that she put no specific policy in place to address coverage issues due to understaffing, even though she knew that housing units (such as the unit where Mr. Mason was detained) would be completely unstaffed for periods of time. *Id.* at 345. On this record, it would not be unreasonable for a jury to find that persistent understaffing and abandonment of intake units significantly increased the risk of serious harm to incarcerated persons on those units — whether that be from medical issues, self-harm, or interpersonal violence — and that Commissioner Carney's failure to mitigate this issue constituted deliberate indifference to those harms. Deputy Commissioner Clark confirmed that such harm arises from post abandonment. *See, e.g.*, *id.* at 886-67 (agreeing that post abandonment, including three hours of abandonment, "puts the inmates and staff overall in great harm."). We therefore deny summary judgment regarding Commissioner Carney because a reasonable jury could conclude that she "with

17

deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm" both with respect to the inadequate medical care and confinement conditions claims. *A.M.*, 372 F.3d at 586 (citation omitted).

### ii.      Deputy Commissioner Clark

In his deposition testimony, Deputy Commissioner Clark acknowledged that he was an administrator responsible for supervising the wardens and ensuring that policies were enforced — including the policy that the pods and blocks never be unstaffed. DI 137-2 at 894. According to Deputy Warden Angelucci, during the pertinent time period in this case, Deputy Commissioner Clark "pull[ed] the strings for making the decisions" when they were short-staffed and needed to redeploy staff to cover different areas. *Id.* at 848. Deputy Commissioner Clark also noted that he would typically review the plans developed by the Warden and Deputy Warden to address issues such as block abandonment, and that he was aware of post abandonment issues at CFCF. *Id.* at 880, 885. And he was familiar with the deaths of the individuals on B1-Pod 4 in the months prior to Mr. Mason's death on that pod. *Id.* at 887-888. Deputy Commissioner Clark even linked block abandonment to serious inmate harm (including death) and agreed that, after an inmate's death, it would be necessary to have "the utmost attention of all of the supervisor staff" — including him and the Commissioner — particularly when the pod was abandoned and the death occurred while it was abandoned. *Id.* at 886-87, 889. Though there is no evidence indicating that Deputy Commissioner Clark was specifically knowledgeable of Mr. Mason's mental health situation, nor the abandonment of B1-Pod 4 during Mr. Mason's mental health crisis, this is not dispositive. Rather, based on the record, a reasonable jury could conclude that, for purposes of the Eighth Amendment, Deputy

Commissioner Clark failed to supervise his subordinates and that this failure effectively denied Mr. Mason adequate mental health care and safety. *Fox*, 726 Fed. Appx. at 868. Summary judgment is denied respecting Deputy Commissioner Clark.

**iii.    Deputy Wardens Angelucci and Butler**

Deputy Warden Angelucci (who was the Acting Warden at the time of Mr. Mason's death and responsible for overseeing CFCF) acknowledged in his deposition testimony that he was involved in ensuring that there was sufficient staffing in the housing areas. *Id.* at 848-49. He likewise stated that, at times and beginning at the start of 2020, he knew that housing pods were unstaffed every day, sometimes for hours. *Id.* at 848-50. Deputy Warden Angelucci even agreed that facilities like CFCF were not safe, and could not be safe, given staffing shortages. *Id.* at 854-55. And he acknowledged that a plan of action, whereby they would ensure that B1-Pod 4 or the entire B Building was never left unstaffed, would have been appropriate "without a doubt" to implement after the death of Mr. Faison on that pod and that it also should have been in place after Mr. Roldan's death. *Id.* at 858. Indeed, Deputy Warden Angelucci tied the lack of proper supervision and response to the fatal outcome for Mr. Mason. *Id.* at 869. This evidence is enough for a jury to reasonably find Deputy Warden Angelucci liable for a failure to supervise claim for either or both of the inadequate medical care and confinement conditions claims. *Fox*, 726 Fed. Appx. at 868.

As for Deputy Warden Butler, she acknowledged that she became aware of critical staffing issues at CFCF beginning in 2022, when she was Deputy Warden. *Id.* at 829-30. Given her position of authority at CFCF, and the evidence indicating that CFCF's staffing issues were well-known and serious — including such shortages' contributions to two other inmate deaths on

the same pod as Mr. Mason — we cannot say that no reasonable jury could find Deputy Warden Butler liable for failure to supervise, again, on both the inadequate medical care and confinement conditions claims. *Fox*, 726 Fed. Appx. at 868. Accordingly, we deny summary judgment with respect to Deputy Wardens Angelucci and Butler.

### iv.    Captains Gray and Simmons

The record establishes that, as captains, Captains Gray and Simmons were responsible for ensuring that CFCF policies, procedures, and operations were being followed throughout the facility, touring the pods, monitoring the lieutenant and sergeants, and monitoring the pods by viewing the surveillance footage. DI 137-2 at 222, 226, 267, 281. This included ensuring that supervisors were supervising their ranks. *Id.* at 226. Both were shift captains during the time that Mr. Mason died. *Id.* at 135 (Exhibit H). Captain Simmons acknowledged that the lack of proper touring would put the inmates at risk, while Captain Gray noted that he was responsible for inmate safety whenever he was a shift commander. *Id.* at 233, 271. This record could reasonably support a finding that, for Eighth Amendment purposes, both captains failed to properly supervise the facility and their subordinates, resulting in harm to Mr. Mason sufficient to establish either or both an inadequate medical care and confinement conditions claim. *Fox*, 726 Fed. Appx. at 868. Summary judgment respecting both Captains Gray and Simmons is denied.

### v.    Lieutenant Graves and Sergeant Swinton

Both Lieutenant Graves and Sergeant Swinton were relatively low-level supervisors during the time of Mr. Mason's death; however, they had supervisory authority over the correctional officers assigned to their respective units. Lieutenant Graves also acknowledged

that pods frequently would be abandoned, at least 2-3 times per week, and that such abandonment jeopardized the facility's security or the inmates' health, safety, or welfare. *Id.* at 193, 195. Lieutenant Graves was the supervisor assigned to B1-Pod 4 on the shift during which Mr. Mason died. *Id.* at 121, 202, 214. At one point in her deposition, she stated that she saw no officers on the block when she arrived for her shift (3 hours and 45 minutes late, due to car trouble) for her shift, yet no one (including Lieutenant Graves) monitored the pod until several hours later. *Id.* at 206. The record also indicates that Lieutenant Graves did not enter B building until approximately two hours after she arrived at CFCF. *Id.* at 214. Based on this, a jury could reasonably conclude that Lieutenant Graves is liable for her failure to supervise, resulting in inadequate medical care and unconstitutional confinement conditions respecting Mr. Mason. *Fox*, 726 Fed. Appx. at 868.

The same goes for Sergeant Swinton. Like Lieutenant Graves, she had supervisory responsibilities over the Correctional Officers. She acknowledged that she sometimes had to cover multiple buildings and that staff had to fill in for missing posts, for the safety of both the inmates and the officers. *Id.* at 159. And she noted that she was aware of staff abandoning their pods at CFCF, and that this happened every day (particularly when staff left for their 30-minute lunch break). *Id.* at 161-62. On the shift during which Mr. Mason died, there is also a material question of fact as to whether Sergeant Swinton was responsible for overseeing B Building — she says she was not responsible for doing so, while numerous other deponents stated or otherwise indicated (as do the records from that shift) that she was responsible for covering B Building. *Id.* at 171-72, 204, 420. And there is evidence indicating that Sergeant Swinton did not go over to B building until staff seemingly first learned about the flooding of Mr. Mason's

21

cell — which was several hours after her shift began.  *See, e.g., id.* at 216.  On this record, a jury could reasonably conclude that Sergeant Swinton is liable for her failure to supervise, resulting in inadequate medical care and unconstitutional confinement conditions regarding Mr. Mason. *Fox*, 726 Fed. Appx. at 868.  We thus deny summary judgment respecting Lieutenant Graves and Sergeant Swinton.

**vi.      Correctional Officers Henry and Rawls**

Shortly before Mr. Mason's death, Correctional Officers Henry and Rawls moved Mr. Mason from one cell to another — during a time in which Mr. Mason was "talking out of his head" and exhibiting unusual behavior.  *Id.* at 54-55, 66-67.  Neither officer referred Mr. Mason for mental health services, nor did they otherwise provide him with mental health assistance.  *Id.* at 67.  Deposition testimony (including from both officers) reflects that such unusual behavior would have been grounds for a mental health referral.  *Id.* at 49, 805-06.  According to Correctional Officer Griffin, neither Correctional Officers Henry nor Rawls informed her of Mr. Mason's behavior during the shift change, even though Correctional Officer Rawls acknowledged that part of the assessment of an inmate for mental health services is based upon information received from the correctional officer from the prior shift.  *Id.* at 51, 81, 83. Additionally, Correctional Officer Rawls transported Mr. Mason without an armband — an infraction which made it difficult to identify Mr. Mason and which resulted in her discipline.  *Id.* at 65.  Based on this evidence, we find that there is enough in the record for a reasonable jury to conclude that Correctional Officers Henry and Rawls failed to provide adequate medical care and constitutional conditions of confinement to Mr. Mason.  *A.M.*, 372 F.3d at 584; *Rouse*, 182 F.3d at 197; *Farmer*, 511 U.S. at 842.  Accordingly, summary judgment is denied for these two

defendants.

**C.      We deny summary judgment on plaintiff's *Monell* claim against the City**

Plaintiff asserts *Monell* claims against the City of Philadelphia on two grounds: (1) that there was a policy, practice, or custom of correctional officers abandoning their housing units, resulting in deprivations of inmates' constitutional rights; and (2) that the City, primarily through Commissioner Carney, failed to provide proper supervision, instruction, and discipline regarding the staffing of pods.  DI 140 at 31-37.  We find that there is sufficient evidence for a jury reasonably to hold the City liable under either or both theories.  As discussed above, there is significant evidence that Commissioner Carney knew that units in CFCF — including the housing unit where Mr. Mason was detained — were habitually understaffed and sometimes completely unstaffed, and that such staffing issues had contributed to deaths at CFCF.  DI 137-2 at 354-55, 357.  Despite this, she made no policy changes to address this situation, even though there was no specific policy in place to address these coverage issues.  *Id.* at 345, 357, 565.  Mr. Mason died on a unit that had been completely unstaffed for several hours, under circumstances that could have been addressed (and possibly ameliorated) had there been proper supervision. Thus, on this record, we conclude that a jury could find that the City was aware of a policy, practice, or custom of understaffing and post abandonment, which proximately caused Mr. Mason's injuries.  *Roman*, 914 F.3d at 798.  To the extent there is any question about causation, that question is best left to the jury.  *Bielevicz*, 915 F.2d at 851.  Similarly, we find that a jury could reasonably conclude that the City failed to adequately train, supervise, or discipline its subordinates in a manner that reflected deliberate indifference and caused Mr. Mason's injuries.

*Forrest*, 930 F.3d at 105.  Accordingly, we deny the City's summary judgment motion.

**D.    Summary judgment on qualified immunity grounds is denied**

Because we conclude that a reasonable jury could find all movant defendants (other than Director Thomas) liable for plaintiff's claims regarding the failure to provide adequate medical care and constitutional conditions of confinement, these defendants are not entitled to qualified immunity at the summary judgment stage.  As the Third Circuit stated in *Carter*, if a plaintiff establishes that officials acted with deliberate indifference toward his or her constitutional rights, then the officials' conduct is "*a fortiori* . . . not objectively reasonable."  *Carter*, 181 F.3d at 356 (citation omitted).  Based on the record before us, a jury reasonably could find these defendants were deliberately indifferent to Mr. Mason's health or safety.  *Farmer*, 511 U.S. at 834.  As such, the jury also could conclude that it was not objectively reasonable for defendants to engage in the conduct discussed throughout this memorandum, *Carter*, 181 F.3d at 356, such that qualified immunity does not shield defendants from liability.  We further conclude that this record could support a finding that it would be objectively unreasonable for defendants to fail to supervise their subordinates at CFCF — if the jury finds such a failure — particularly given the deaths that occurred at CFCF related to unstaffed pods and the recognition among several defendants that unstaffed pods led to significant safety risks.  *See, e.g., Fox*, 726 Fed. Appx. at 868 (discussing the unreasonable risk of a constitutional violation, officials' knowledge of and indifference toward such a risk, and the constitutional harm resulting from the failure to supervise).  Defendants are therefore not entitled to judgment as a matter of law on qualified immunity

24

grounds.

## V.    CONCLUSION

Defendants' joint motion for summary judgment is granted in part and denied in part. We grant summary in favor of Defendant Director Christopher Thomas.  Summary judgment is denied with respect to all remaining individual movant defendants and the City of Philadelphia. An appropriate order accompanies this memorandum.